All right, we'll now hear United States v. Velarde, number 20-1115. Mr. Scabavia, you may proceed. Thank you, your honor, and may it please the court. Mark Scabavia on behalf of Alvaro Pablo Velarde. This case has many issues. I want to start with issue of Cadet Carlos Hinojosa. I wanted to use Cadet Hinojosa as a trial witness. I wanted to use him because he was the roommate of Velarde. He was the very first person that Velarde talked to after the incident, which was only six hours after the incident, and he was the only person that Velarde talked to before any suspicion anything was wrong. Hinojosa also brought to table that he saw and observed a romantic relationship between the victim and Velarde before the incident, and the day before the incident, they were actually kissing in his room. So I thought that would be a very important testimony for the trial, but I could not use Hinojosa, and the reason why I could not use him is because Hinojosa said Velarde told him the victim said no three times during the incident. Not only did he tell me that in two separate pre-trial interviews, but he also told OSI that that appeared in a news article during the trial, and it appeared in court documents. So what could be more damaging in a rape case than when the victim tells the defendant no? In our society, it's well known that no means no. That would be severely damaging to my case, so I could not call him as a witness. But after trial, on post-trial, right before sentencing, Cadet Hinojosa calls up Velarde on BTC and recants all these no statements that he said he said. And he said that, and then because of this, I went ahead and interviewed him again post-trial. And so now, all this information, all this trial testimony that I could have used, that I couldn't use before, I could have used now. So I argue that that is, for purposes of new evidence, is new evidence, because I could not in any way use it at all. Counsel, as to these post-trial statements that you'd like to use, the motion for new trial didn't present any of those statements in the form of recordings or transcripts or affidavits. Why isn't the record insufficient for that reason alone? On this issue. Your Honor, I believe that the motion for new trial, which is in the record, contains the transcript of that BTC conversation between Velarde and Hinojosa. It was translated. No, no, no. I'm talking about the post-trial recantations. The post-trial recantations, one of the recantations was that BTC conversation. Beside that, it was to me, and I believe I summarized what he said to me in my motion for new trial. In my motion for new trial. But after I talked to Hinojosa, and after he came clean with me, he gave me more information that I never knew before as well. One of these things is that the victim told many people about the incident afterwards, which I never knew about, that the Exhibit A, of course, is the victim. It's a text message competition between the victim and Velarde saying, not the victim, but the victim and one of her friends saying how she's attracted to Velarde. How she doesn't want him to talk about it or anything. I found out from Hinojosa after trial, she was hiding that from him, even though her and Hinojosa were really good friends. He found out that she was hiding it from him the whole time. And then most importantly though, what I get from Hinojosa is I get pointed in the direction of Cadet Lily Atlantis, who I never talked to pre-trial, even though I talked to more than 30 cadets at the Air Force Academy over several months. I never heard of a Cadet Lily Atlantis, but he pointed me in a direction post-trial and she has, which I'll explain a little bit later, a lot more to say. Counsel, could we just isolate what statements post-trial were actually new evidence? I mean, as I understand it, one of them is he denied telling Mr. Velarde that Mr. Velarde told him that the victim said no. And then he also said he no longer believed that Mr. Velarde was guilty. Those seem to be the new evidence statements, but isn't that it? Those are the only new evidence statements. Your Honor, besides that, the fact that the victim hid trial exhibit A from Hinojosa, that she actually hid that text message conversation from him. That's new evidence? Yes, Your Honor, that was. I never knew that. He said he told me post-trial that after the trial occurred, she hid those conversations from him. Even though they happened to trial, Hinojosa wasn't there watching the trial because he was a potential witness. He was sequestered, but he never knew about those conversations until way later, and she hid it from him for months after the trial. And if that answers the question, Your Honor, I want to talk about Hinojosa's credibility because the district court said that he was not credible because of a conviction of his friend and of falling out with a victim. It says, the district court just says that as the reason only, but there are lots of reasons to believe that he's actually very credible. First is the fact that he actually recanted on his own without anybody telling him to do so or asking him to do so. He did so. It was a surprise to everybody, and everybody was surprised that he recanted. But what's more important, and we also found out that the reason why he was lying beforehand was because OSI was intimidating him like he intimidated other witnesses in the trial, which is on the trial record. Cadets Lobiendo and Pierce were both OSI tried to put words in their mouth saying, we don't believe you, you're going to get in trouble using the honor code against them. But I think there's no question that the honor code is a huge deal at the Air Force Academy. All my witnesses, all six of them and the victim all testified that if they violate the cadet honor code, that they will be subject to expulsion, and that's just lying. So by coming to me and by coming clean to Blarty and coming to me and recanting everything he's saying, he's doing so at the expense of possibly being kicked out of the academy for in losing his entire Air Force career. And I cannot think of anything that makes me more credible than that if they're going to go ahead and go back what they said, talking to official parties like me saying that they were lying. So I think it makes them extremely credible. Turning now to Cadet Landis, because in order to understand why Cadet Landis was so important, a person I never knew about beforehand, Cadet Landis is important because right after the incident, victim told many people about the incident. She never mentioned anything about ever being hit in the back of the head by Velarde. And even when she saw the doctor seven days later, she said she hit her head on the bedpost, the bed. It only wasn't until OSI talked to her 14 days later on their second interview that she said Velarde hit her in the back of the head. And then she maintains that throughout the rest of time, through trial, through her testimony, that the reason why she got a concussion was because Velarde hit her in the back of the head. Well, I talked to Cadet Landis now post-trial, and I find out that right after the incident, Cadet Landis and victim became acquaintances or confidants where victim would talk to Landis once a week for a period of six months up to trial. In fact, she confided in Landis so much that they made Landis her roommate during trial in Denver. And when I talked to Landis and I asked her about it, Landis told me that she consistently told her that she got the concussion from hitting her head on the bedpost, not being hit in the back of the head by Velarde. This was her confidant through the entire trial. So why she's testifying in trial, saying that she was hitting the back of the head by Velarde, she's telling her confidant the whole time that she hit her head bedpost. This is a huge, huge inconsistency. When did Ms. Landis become her roommate? I'll clarify that, Your Honor. She was her roommate in the Air Force Academy, but when they moved, when the Air Force Academy did the trial, when they went down to the trial, all the cadets went down for the trial, they put Cadet Landis and the victim as roommates together in Denver during the trial. That was when they were roommates. That was only when they were roommates. But that's, even then, Landis never testified at trial? No, Your Honor, she did not. And I never knew about her at all throughout my entire time. Didn't know anything about her? She was never identified as a witness? Not by anybody, not by any cadet, not by any of the cadet, cadets I interviewed or officers or anything. Nobody ever pointed me in Landis's direction. But she directly contradicts the victim in a dramatic fashion. And not only does she impeach the victim dramatically, but she also corroborates Velarde's story that he never hit her in the back of the head. And I believe that is a huge deal. And that's why if I had knew that beforehand, Landis would probably have been my first witness in trial, impeaching the victim and then subsequently corroborating Velarde's account of the events. Were there other witnesses who testified about whether she said she got hit in the back of the head or hit her head on the bed rail, one versus the other? Weren't there other witnesses who kind of testified contrary to her about that? There were, but it wasn't as dramatic, it wasn't as clear. Explain. For example, a lot of my witnesses said that Velarde told them that, it was more like an absence of saying it. Like every, all my witnesses, none of them said Velarde said that he hit her in the back of the head. None of the, I don't know if any, I can't remember off the top of my head if any of the government's witnesses said that she said he hit him in the back of the head. I believe at least two of them said that. I believe two of the government witnesses said that victim told them that Velarde hit her in the back of the head. And did anybody say that victim told them that she hit her head on the bedpost? Was there any other testimony about that? No, no, your honor. Other than? No, your honor, other than, no, there was none. There was none. It was the only time it came out that she hit her head on the bedpost was when she initially told it to OSI, but she never told any of the witnesses. None of the witnesses said that. It was only Landis that said that afterwards. This would have went to the victim's credibility then, right? Yes, your honor. And also to the, and also to the defendant. To the impeacher. Impeacher. Impeacher, sir. Yes, your honor. And corroborates my, and corroborates the defendant's account. Okay. Moving on. There's a lot of other things here, but I also wanted to talk about the, I also want to talk about the next most important thing, which is, which is Dr. Jackson's statements, which were misstatements of what his qualifications were by the assistant United States attorney during rebuttal argument. Those statements were that Dr. Jackson is one of the preeminent concussion doctors in the United States. Dr. Jackson is the principal researcher of one of the biggest concussion studies to have ever been conducted. And that Dr. Jackson is the leading concussion expert. So we have somebody that was, apparently had a concussion, but she sees somebody for a concussion 16 times over five months for concussion, which is just not, people just don't do that, your honors. People don't see a concussion doctor 16 times over five months for a concussion in any normal sense. Is there an objection to that? No, your honor. And that's why this was for plenary review. Was it, was there an instruction to the jury that what counsel says is not evidence? Oh, I believe there was a, I believe there was an instruction that off the top of my head. I think there was. Combine the requirements of plenary with that instruction. Doesn't that indicate that the plenary standard is not met? I don't think so in this case, your honor, because it's such a close case. I think that's what takes the balance of that one, because this case was so close for many reasons, but you have, you have these over, you have these statements and then you have this extreme amount of times you're seeing a doctor or for a concussion. And then all, and then, and then because of these overly broad or these overly stated qualifications, such an unbelievable story of 16 times over five months for being hit in the back of the head is makes the unbelievable become believable in the eyes of the jury. And unless you follow the instruction that the judge gives you, and that is the evidence is what you hear from the mouths of witnesses, not from the mouths of the lawyers. Yes, your honor. But then also the, the, the, the qualification of Dr. Jackson, which his qualifications were, was simply as a concussion doctor. That's all he was counsel. Could I ask you about the PTSD diagnosis? Yes, your honor. Could you explain how that is relevant and material to the defense? Yes, your honor. Okay. So the PTSD was something that I never knew about until I talked to Dr. Jackson after the trial, when he mentioned PTSD, now they, they say they, they given me breathing. They say they given me diagnoses and stuff about, you know, having nightmares, flashbacks, episodes, and panic and stuff, which could I best, I guess, be mental health problems. But my point is, I believe that she had PTSD, not from the incident, not from the incident at all, but she had PTSD and was diagnosed with it before the incident even happened. And I think there's a, I think there is a mental health file over there in the Air Force Academy that has a PT, PTSD diagnosis that has not, that has not been given to me. I'm asking, I'm asking how that helps you. I mean, what, what, what difference does this make? What difference? Because it gives a whole new reason why she would fabricate. Is she more sensitive? She, she's had previous because, because yeah, because it adds a whole new theory of why she would fabricate the story. That's the answer to that. And this is based on your, your opinion or. Yes, Your Honor. Well, I mean, if I, if there was any evidence that would, I mean, did you offer anything that would show that if this was the case that she previously had PTSD, that she'd be more inclined to fabricate in this instance? Well, Your Honor, I never knew she had any PTSD or anything. I never knew about PTSD diagnosis or anything, or any possibility of it until after trial. And so if I have, had, I knew about it before trial, if I knew she was diagnosed with PTSD before trial, then I would have hired an expert to explain to the jury how that could affect her, her veracity in this case, or her reason to make up the story. Thank you, counsel. I think we've gone over time a bit and we'll now hear from Mr. Grewal. May it please the court, Bishop Grewal on behalf of the United States. I guess I'll start with the closing argument, allegation of error. First, this is reviewed for plain error. And we have considered that the third statement, the first two, we believe are properly supported in the evidence. The third one, I think was a bit of an embellishment, a little bit of an exaggeration in rebuttal close in terms of when he says that it's the leading concussion expert who runs the largest study. But as this court said in Lopez Medina, which is cited in our brief, 596 F3rd at 740, quote, a stray improper comment in closing is no basis for upsetting a trial, end quote. And then it goes on to say, this is especially true, whereas here the jury is advised that arguments of counsel are not evidence. That happened here, appendix page 705, right after closing arguments are over, the judge instructs the jury, the arguments of counsel are not evidence. You're to decide guilt and innocence based on the evidence. Moreover, this was not a case of competing experts. While counsel may feel that seeing somebody 16 times for a concussion is not what you do, there was no other expert who came on and testified about that. There was no testimony about that whatsoever. The expert here basically went uncontradicted. And so whether he was simply an expert or the leading expert really didn't matter here. Moreover, when as much as the government did in their closing arguments at pages 676 to 677, they're relying on what our expert said. And they brought out testimony from our expert that her concussion could have been caused by a judo injury a couple of days before the sexual assault here. So there's certainly not plain error here or anything worth reversing on the closing argument point. Unless the court wants to hear any more about that, I'm going to turn to the new trial evidence. Let me start, I guess, with what counsel says is that their best evidence, I guess, the cadet Landis testimony. And in particular, the statement that the victim told her that she got the concussion from hitting her head on the bedpost. Judge Moritz, to your earlier question, it's not actually true that nobody at trial said that she'd said a bedpost caused it. In fact, the concussion expert said that when he was treating her, she told him she got the concussion from hitting her head on the bed. So at most, this was going to be cumulative evidence. Moreover, the jury heard that she hadn't recalled about what it exactly caused her to lose consciousness until several weeks later. And finally, Mr. Velarde hitting her or her hitting the bed are not mutually exclusive things in terms of causing the concussion any more than a linebacker hitting a quarterback or the quarterback hitting the turf is necessarily the cause of concussion. It's not inconsistent to say he hit her and she hit the bed frame and that caused the concussion. In any event, that evidence, because it had already been presented by our witness, the concussion expert, was cumulative and wasn't probably going to lead to an acquittal, which is the standard for new trial evidence. The only other new evidence from cadet Landis is, again, that IC tried to convince her that Mr. Velarde was guilty. That's no more consistent with innocence than it is with guilt. It wouldn't have probably led to an acquittal either. The PTSD evidence, I would direct this court to appendix 129 through 132. That's where the district court here went through a litany of the things in the discovery that if they didn't talk about it being PTSD itself, at the very least should have put counsel on notice that they had to do some due diligence here to see about the PTSD. But even if they had done that diligence and it came out it's their burden and they've offered nothing to suggest what the cause of that PTSD is, here that PTSD evidence could be as damning as it could be exculpatory. That the PTSD could just as easily have been caused and probably was caused by the sexual assault here. So that wasn't going to help. Let's turn to cadet Hinojosa. And I think they allege five different pieces of new evidence. One of them is that Mr. Hinojosa no longer thought Mr. Velarde was guilty. Well, that's simply inadmissible. It couldn't have changed the trial here. You can't call witnesses to testify whether a defendant is guilty or innocent. Their opinion on that is inadmissible. That's a question for the jury. IC's motive to lie because of the cadet honor code. Well, first of all, that's just impeaching. But secondly, as counsel himself pointed out, he had six cadets come on and testify about the cadet honor code. Mr. Hinojosa being a seventh saying the exact same thing wasn't going to be something that was going to change the trial here. Moreover, the only way it's a motive for her to lie is if she lied in her initial statement. But the cadet honor code itself created an incentive for her not to lie initially. And so that wasn't going to help him in terms of probably leading to an acquittal. The hidden texts from Mr. Hinojosa. These were cumulative pages 215 to 250 and 250 to 251. You hear about how the she actually had texts from the investigators themselves. And so that and she explained why she did that and that she was worried at first. But then she goes and brought those hidden texts to the to the attention of the investigators. So, again, that was cumulative that she'd hidden the text. The fact that she'd also hidden them from Mr. Velarde's best friend and college roommate, Mr. Hinojosa, was not probably going to lead to an acquittal. Finally, we have two last pieces. He said that she told so many people about it. Well, that's no different than her telling Cadet Landis. I guess the theory is somehow that if it was a real rape, she wouldn't tell anybody. I don't think there's anything to support that. It's as inculpatory as it is exculpatory. And last but not least, he offers the recanted statement about whether she said no. He says he couldn't have called her. That's not actually true. What he didn't want to call or he says he couldn't have called Hinojosa. That's not true. He didn't want to call him because as he notes, Mr. Hinojosa had told the investigators that so the jury never hears about that. They never hear about that because he's not called a trial. After trial, Mr. Hinojosa says, well, no, that's not what he said. He said that she told him three times. It's not correct. Well, if you bring that to a jury, that's not going to lead to an acquittal either. First of all, let's just assume that the jury hears Mr. Hinojosa get up there and say, yeah, well, she told him three times. It's not correct. That doesn't suggest consent here. But that isn't all that a jury would have heard. They would have also heard his prior inconsistent statements where he said, well, actually, Velarde told me she said no three times. In his reply brief, he does suggest that somehow that Mr. Hinojosa somehow was going to say, well, Velarde actually told me she never said no. There's nowhere in their motion for a new trial below that that is what's suggested. It's only that he was recanting this statement that she, in fact, affirmatively told Velarde no three times. It wasn't that there was any commentary about whether she said no or not. And obviously, the district court here can only make a ruling based on what they're offering below. That wasn't offered. It was waived to the extent they're trying to say Velarde said she never said no. The final point on the new trial evidence, and then I guess I'll turn to the exclusion of the mother's testimony. This court has said several times that these are not favorably regarded and they should only be regarded with great caution. And it's also said because the district court is the one who has heard all the trial testimony and seen all the evidence that it owes great deference to that fifth prong about whether or not this would probably lead to an acquittal or not. District court found it wouldn't here. And we're not talking about a plain air standard where it's a reasonable probability of a different result. We're talking about a legitimate jury verdict that can now only be overturned if it's more probable than not that the jury would have acquitted based on this new he has met that burden here on the recanted. No, it isn't the primary problem that it's impeaching. So I think that's a problem with much of the evidence. I think it's impeachment. I think, you know, there are times when evidence can be both substantive and impeaching. And I suppose to the extent it's going here to the actual element of whether she consented or not, I could see it possibly being considered substantive as well. It's a little different. It's not substantive. It's just saying I didn't say that before. Right. So it's not substantive that it's not substantive. It's just talking about what this guy said before and what he says now. Right. And I guess it would just be the evidence of him saying that he said it's not correct three times to the extent it's substantive. I think it's substantive evidence of his guilt, not his innocence. But it would just be, you know, if already, in fact, told in a host, it's not correct three times or said she said no three times, either one of those would be more evidence of his guilt. But otherwise, just as you point out, your honor, the impeachment. All right. Thank you. Unless there are questions about the trial evidence, I guess we'll move to the rule 401 and 403 exclusion of the mother's testimony about whether the victim laughed when she got off the stand. First of all, I'd point out, I think the court is correct here when it's excluded under 401 because there simply wasn't the context to know what that laughter meant. There was nothing to suggest that it was more incriminatory than exculpatory because we didn't know what conversation was going on. We don't even know when and where exactly it happens. He says it's immediately after she got off the stand. But throughout his reply brief and what he said below is it's when she's leaving the courthouse. The courthouse is a big place. You got to go down in an elevator. And none of that's inconsistent with what the government put forth that this came after she finished filling out her administrative paperwork and after she and her friends were getting together to go decide where they want to get lunch when they're walking out the courthouse. None of that suggests that that's incorrect. Perhaps in a situation where the the evidence offered is the second she leaves the stand and that door closes behind her, she bursts out into laughter. Maybe that would have some probative value, but they didn't they didn't offer that. They didn't offer evidence suggesting that. Furthermore, there was a rule for a three ruling here that was also correct. And that's because the district court recognized that we were going to have now a mini side trial on a collateral issue that was risk going to delay the case and was going to risk confusing the jurors. The jurors had been told you're supposed to listen to what happens in this courthouse, this courtroom, not be looking at your own observations. Well, now they're going to hear a witness get on and say, I saw this in the hallway. The jurors might be at risk of thinking they can look at what they saw on the highway in the hallway to decide such cases. Moreover, we're going to have to bring in not just Velarde's mother, who was under a sequestration order, but now the friends who were with the victim when she was laughing so that they can provide context to the story. And there's there's no evidence that they weren't in the courtroom either. So that would also be a violation of the sequestration order. And so and all of this for very minimal probative value, because we don't know why she's laughing. We don't know what the basis for this is. And again, it's an incident, you know, six months after the rape. There's nothing suggesting that there is any improper way for somebody who's been raped to respond to that. And so this was simply going to be unfair prejudice. The court was right to exclude it. And we would ask this court affirm. I'm happy to answer any other questions the court might have about this case. I just had one on your last point. Could you explain a little bit more what your argument is on sequestration? I'm not sure I was following that in your brief. Sure. So I think the reason we tend to have sequestration orders for witnesses is because we don't want them observing testimony, tailoring their own testimony based on what's happening in court or even making up stuff based on what's happened in court. And so we say we're not going to allow those witnesses in. The only reason she's even suggesting that this laughter that laughter sticks out to her is because she's in court and she said she saw the victim crying on the stand like so she's now creating testimony that would never have come forward. But for the fact that she's in that in that courtroom and that's what sequestration is supposed to prevent is people sitting there and coming up with things that they want to say now after having watched other witnesses go or or tailing their their testimony to try and shape the trial in that way. Thank you. Any further questions? All right. Thank you, your honors. I'm happy to see the remainder of my time. Thank you, counsel. Thanks to both counsel for your arguments this morning. The case will be submitted and counsel are excused.